ARMAND SCHMOLL, INC. *v.* UNITED STATES (No. 4600) [1]

United States Court of Customs and Patent Appeals, December 12, 1949

---

[1] C. A. D. 420.

*Lamb & Lerch (John G. Lerch* of counsel) for appellant.

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

*Walter S. Logan (Rufus J. Trimble* and *Lyon Boston* of counsel) for Federal Reserve Bank of New York as *amicus curiae.*

[Oral argument October 5, 1949, by Mr. Lerch, Mr. Donohue, and Mr. Trimble]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court (Third Division), rendered in conformity with its decision, C. D. 1097 (20 Cust. Ct. 137), overruling the protest of the importer (No. 974899–G/15422) against the duty assessment made by the Collector of Customs at the port of New York upon hides imported from Brazil.

It appears that the hides were imported in 1935, the date of exportation from Brazil being October 7, 1935. The entry was liquidated by the collector June 2, 1938, and protest under section 514 of the 1930 Tariff Act was filed by the importer within the statutory period. The decision of the trial court was rendered March 24, 1948.*

The following statement of the case is quoted from the brief filed before us on behalf of the Government:

The consular invoice and other entry papers in this case show that on October 7, 1935, a shipment of hides was exported from Brazil consigned to appellant. Entry was made at the port of New York on October 22, 1935. The entry was liquidated on June 2, 1938, when the collector of customs converted the currency of the invoice from milreis to dollars at the rate of .083740. This rate and others for the currency of other countries had been published in the Treasury Decisions in a directive to collectors stating that they were the rates which had been certified by the Federal Reserve Bank of New York under authority of Section 522 (c), for the period of October 4 to 10, 1935 (68 Treas. Dec. 344–345). A photostatic copy of the original certification for October 7, 1935, was received in evidence as Exhibit 1 (R. 38a). Opposite the rate certified for Brazilian milreis (as well as the currencies of several other countries) was an asterisk referring to a note on the certificate stating "Nominal rate. Firm rates not available."

Prior to the trial, plaintiff's counsel served on the Federal Reserve Bank of New York a subpoena *duces tecum* requiring the bank to produce its records relating to the rates of exchange of the Brazilian milreis on the date of exportation of the instant merchandise (R. 16). The bank appeared through its attorney and moved to quash the subpoena (R. 10). The motion was granted (R. 22) and a review of that action is sought in this appeal. In the course of the hearing there was extended argument between appellant's counsel and counsel for the bank with respect to the right of the bank to claim immunity from disclosure of its records because it functioned as a governmental agency when it certified rates of exchange for foreign currencies under Section 522, *supra.* This aspect of the case

---

* The long delay between the filing of the protest and the hearing and decision by the trial court was due to legitimate causes unnecessary to be recited in detail.

will not be considered by appellee because here, as in the court below, the Federal Reserve Bank has appeared and obtained permission to file a brief addressed to this aspect of the case.

The statement of the case in the brief on behalf of appellant, although expressed in different phraseology, does not differ in any material respect from the foregoing.

The *amicus curiæ* brief alluded to in the statement quoted from the Government brief was received by the court and oral argument by counsel representing the Federal Reserve Bank was heard.

We quote from that brief, as an appropriate part of the statement of the case, the following (reference to record pages being omitted as indicated by asterisks):

In the present proceeding, the appellant sought to have the United States Customs Court find independently a new and different rate of exchange for the Brazilian milreis for use by the Collector in reliquidating the entry of hides * * * in lieu of the rate certified by the Federal Reserve Bank of New York to the Secretary of the Treasury and proclaimed by the latter * * * . Appellant's prayer on the present appeal is that this Court instruct the Customs Court so to find a different rate * * *.

We here quote section 522 of the Tariff Act of 1930, which defines the method of determining the rate of exchange to be employed in converting the currency named in an invoice of imported merchandise for the purpose of duty assessment:

### SEC. 522. CONVERSION OF CURRENCY.

(a) *Value of Foreign Coin Proclaimed by Secretary of Treasury.*—Section 25 of the Act of August 27, 1894, entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes," as amended, is reenacted without change as follows:

"SEC. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year."

(b) *Proclaimed Value Basis of Conversion.*—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

(c) *Market Rate When No Proclamation.*—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign

currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

The brief on behalf of appellant, under the heading of "The Issue," submits the following in question form:

1. Is it incumbent upon the Federal Reserve Bank and the Secretary of the Treasury to certify and publish the "buying rate" for foreign currencies at noon of each day under the provisions of Section 522 (c) of the Tariff Act of 1930, that rate varying more than 5% from the proclaimed rate?

2. Upon failure of the Federal Reserve Bank and the Secretary of the Treasury to certify and publish the "buying rate" for Brazilian milreis on a date material to the issue in this case, has the Customs Court jurisdiction to review the decision of the collector applying a different rate and correct the same?

3. In response to a *subpoena duces tecum*, is it incumbent upon the court to compel the production of the evidence sought before deciding a motion to quash on the ground of privileged or confidential communications?

4. Is the Federal Reserve Bank bound to produce the records subpoenaed and the Court bound to receive them as competent evidence?

The argumentative section of the brief for appellant seems first to emphasize the third and fourth questions so stated.

There is no controversy with respect to the first question stated in the brief. The trial court held:

No question is involved here concerning the value of the Brazilian milreis as estimated by the Director of the Mint under subsection (a) above, nor is it disputed by the plaintiff that the proclaimed value varied "by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation," i. e., October 7, 1935. Plaintiff's contention as set forth in its brief is that the collector failed to comply with the terms of the statute in that he used as the basis of conversion a rate which had been certified to the Secretary of the Treasury by the Federal Reserve Bank of New York as a "nominal rate" (T. D. 47910, *supra*), and that by so doing he disregarded the buying rate for cable transfers.

The answer to appellant's first question as stated in the brief, obviously, is "yes," but that answer does not settle any question here vital.

The second statement is peculiarly phrased. It is in question form, but the portion which actually constitutes a question is based upon an affirmative assertion to the effect that the Federal Reserve Bank and the Secretary of the Treasury failed to certify and publish the "buying rate" for Brazilian milreis on a date material to the issue in this case.

It seems to us that before the question which relates to the jurisdiction of the Customs Court requires any consideration it must be determined whether the assertion of failure is correct.

. In other words, as we view the controversy, the fundamental issue here is whether the Federal Reserve Bank of New York complied with the mandate of section 522 (c), *supra*—specifically whether, within the meaning of that statute, it determined and certified the buying rate for Brazilian milreis in the New York Market at noon on the 7th day of October 1935.

As has been indicated, counsel for appellant at the trial caused to be introduced in evidence a photostatic copy of a certification by the Federal Reserve Bank of New York addressed to the Secretary of the Treasury, dated October 7, 1935, which read, in part, as follows:

In pursuance of the provisions of Section 522 of the Tariff Act of 1930, dealing with the conversion of foreign currency for the purpose of the assessment and collection of duties upon merchandise imported into the United States, we have ascertained and hereby certify to you that the buying rates in the New York Market at noon today for cable transfers payable in the foreign currencies are as shown below.

The foregoing is followed by a table headed "Values of Foreign Currencies."

The table is divided into four columns. The first column gives the names of countries; the second, the names of the monetary units of those countries. The third is headed "Noon Buying Rate for Cable Transfers in N. Y. Value in U. S. dollars." In several instances, the value stated in the third column is followed by an asterisk, and in the fourth column, under heading "Remarks," there appears "*Nominal rate. Firm rates not available." One of the U. S. values stated (with an asterisk) is .083740* for milreis of Brazil, which, as we understand it, prescribes the value of the Brazilian milreis to be used in the assessment of duties upon merchandise exported from Brazil on October 7, 1935, expressed in terms of United States dollars.

That was the value which the Secretary of the Treasury caused to be made public as the buying rate contemplated by section 522 (c), *supra*, and the collector assessed and collected duties on the hides accordingly.

It is noted that the only duty imposed upon the Secretary of the Treasury by the statute is that of making public the buying rate certified to him "at such times and to such extent as he deems necessary." The ascertainment of the rate is made the exclusive function of the Federal Reserve Bank of New York.

The pertinent phraseology of appellant's protest addressed to the collector, as originally filed, reads:

* * * The reasons for objection to your action are that an erroneous and an improper rate or value was used by you, at the time of liquidation, in converting the milreis value of the hides into United States dollars. You have collected

duty in amounts greater than that contemplated by law and you have erroneously interpreted Section 522 of the Tariff Act of 1930, resulting in a greater exaction than contemplated by law.

To the foregoing there was subsequently added by amendment:

Moreover, you should have converted at the buying rate in the New York market at noon on the date of exportation of the merchandise, under Section 522 (c), such buying rate varying by more than 5 per centum from the rate proclaimed by the Secretary of the Treasury under the provisions of Section 522 (a).

It will be observed that the protest neither specifies nor claims any rate as being a "buying rate." It merely attacks the rate which the collector applied.

Appellant's contention, as developed before the trial court and before us, grows out of the use of the notation "Nominal rate," appearing in the fourth column of the table hereinbefore described.

In its decision in the case of Barr v. United States, 324 U. S. 83, 88, 89, the Supreme Court recites the history of the "search which has been made for a measure of the true dollar values of imported merchandise for customs purposes which was accurate (see Cramer v. Arthur, 102 U. S. 612, 617) and at the same time administratively feasible and efficient," which we here quote:

* * * In the beginning Congress prescribed specific dollar values of specified coins. Act of July 31, 1789, § 18, 1 Stat. 29, 41. Not long after, the President was given authority to prescribe regulations for computing duties on imports where the original cost was exhibited in a depreciated currency of a foreign government. Act of March 2, 1799, § 61, 1 Stat. 627, 673. In 1873 Congress provided for an annual estimate by the Director of the Mint of the full metal value of standard coins of the various nations and a proclamation of the value by the Secretary of the Treasury. Act of March 3, 1873, 17 Stat. 602. That estimate was required to be made quarterly rather than annually by the Act of October 1, 1890, § 52, 26 Stat. 567, 624. Then came the Act of August 27, 1894, § 25, 28 Stat. 509, 552, which retained the provision for the estimate and proclamation of metallic values and gave the Secretary of the Treasury power to order a reliquidation at a different value on a showing that the value of the invoice currency in United States currency was 10 per cent more or less than the proclaimed value. United States v. Whitridge, supra. The procedure under the latter provision depended on a consular certificate to establish the percentage of depreciation of the currency. T. D. No. 23725, 5 Treas. Dec. 396. There was thus no single source (and none at all in the United States) to which customs officials could look to determine the extent to which foreign currency had depreciated. Moreover, violent fluctuations in foreign exchange rates had occurred after the first World War. It was for those reasons that § 403 (c) was added to the Emergency Tariff Act of 1921, 42 Stat. 9, 17. See S. Rep. No. 16, 67th Cong., 1st Sess., p. 16; H. Rep. No. 79, 67th Cong., 1st Sess., p. 12; Fry & Friedsam v. United States, 12 Cust. App. 486, 489. And § 403 (c) of the 1921 Act now appears as § 522 (c) of the 1930 Act on whose meaning the present decision turns.

It may be said that in the Barr case, supra, the Supreme Court reversed the decision of this court (32 C. C. P. A. (Customs) 16, C. A. D. 279), thereby upholding that of the United States Customs

Court (C. D. 801). In that case, which involved section 522 (c), *supra*, the Federal Reserve Bank of New York (because of certain conditions in England growing out of the war in which England was then engaged) certified two rates for the English pound sterling—one designated as the "free" rate and the other as the "official" rate. The Secretary of the Treasury notified Collectors of Customs that he would publish only the "official" rate, which was higher than the "free" rate, and directed them to use that rate on merchandise imported from England. The collector applied the "official" rate in the assessment of duty on woolens, the merchandise there involved, and the importer protested.

In sustaining the judgment of the Customs Court, the Supreme Court held, in effect, that under the facts there appearing the "free" rate which had been certified was more truly representative of the actual dollar value than the "official" rate, and declined to hold that "only one buying rate must be determined and certified."

We think it obvious that there is nothing in the decision in the *Barr* case, *supra*, which is of aid to appellant in the instant case. Manifestly, the Reserve Bank did not find two buying rates for Brazilian milreis. True, it referred to "nominal rate" and stated "Firm rates not available," but there is nothing to indicate that there was any intention of treating the nominal rate as something different from the buying rate. Had it intended to find two buying rates, it doubtless would have done so with the same clarity which marked its finding in the *Barr* case, *supra*.

The trial court directed particular attention to that provision in section 522 (c) reading:

* * * In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

and thereafter said:

* * * It is plain to the court that in denominating the rate certified as "nominal" said Federal Reserve bank indicated that such rate has been determined by calculation under the circumstances surrounding Brazilian currency transactions on the day of exportation of this merchandise.

With that holding we agree.

We think the following from the Supreme Court's decision in the *Barr* case, *supra*, is of particular interest here:

* * * The exercise of the Bank's discretionary power under § 522 (c) is in the category of administrative or executive action which this Court held nonreviewable in *Cramer* v. *Arthur, supra,* [102 U. S. 612] and in *Hadden* v. *Merritt,* 115 U. S. 25, 27–28. And see *United States* v. *Bush & Co.,* 310 U. S. 371, 380. But the function of the Secretary in this regard is purely ministerial * * *.

The holding in *Cramer* v. *Arthur*, *supra*, is summarized in the first headnote of the opinion as follows:

1. The valuation of foreign standard coins, which the act of March 3, 1873, c. 268 (17 Stat. 602; Rev. Stat., sect. 3564), requires the director of the mint to estimate annually, and the Secretary of the Treasury to proclaim on the first day of January, is as binding on collectors of customs and importers, as if declared by statute; *and evidence is not receivable to show that it is inaccurate.* [Italics ours] *The Collector* v. *Richards* (23 Wall. 246) cited and reaffirmed.

It is obvious that the principle announced by the Supreme Court in its opinion stating the reasons for its decision is directly in point here. The Supreme Court followed it in its decision of the *Hadden* v. *Merritt* case, *supra*, and in the case of *United States* v. *Whitridge*, 197 U. S. 135. The United States Customs Court and this court have followed it in numerous cases. Illustrative we cite the following decisions of this court: *J. K. Clarke* v. *United States* (1930), 17 C. C. P. A. (Customs) 420, 422, T. D. 43866; *Amalgamated Textiles, Ltd.* v. *United States* (1936), 24 C. C. P. A. (Customs) 74, 79, T. D. 48378; *J. S. Staedtler, Inc.* v. *United States* (1937), 25 C. C. P. A. (Customs) 136, 140, T. D. 49255.

We find nothing in the opinion in the *Barr* case, *supra*, which indicates any disposition on the part of the Supreme Court to depart from the rule so long followed. Until the Congress changes the rule by legislation, or the Supreme Court itself overrules it, we feel bound to follow it. In view of this holding, other questions here raised need not be discussed.

The judgment of the Customs Court is *affirmed.*

By reason of illness, HATFIELD, J., was not present at the argument of this case and did not participate in the decision.